**DWOSKIN WASDIN LLP**
Eric S. Dwoskin (*pro hac vice forthcoming*)
edwoskin@dwowas.com
433 Plaza Real, Ste. 275
Boca Raton, Florida 33432
Tel.: 561-849-8060

**LAW OFFICES OF ROBERT G. LOEWY, P.C**
Robert G. Loewy (SBN 179868)
rloewy@rloewy.com
20 Enterprise, Suite 310
Aliso Viejo, California 92656
Tel.: 949-468-7150

*Counsel for Plaintiff and the Proposed Classes*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GLENN STRICKER, individually and on behalf of all others similarly situated, | Case No.: |
| Plaintiff, | CLASS ACTION COMPLAINT |
| vs. | DEMAND FOR JURY TRIAL |
| CENTR LLC, a Delaware limited liability company, | |
| Defendant. | |

Glenn Stricker ("Plaintiff"), individually and on behalf of all others similarly situated, brings this Class Action Complaint against Centr LLC ("Centr" or "Defendant") for violations of the Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA"), and upon personal knowledge as to Plaintiff's own conduct, and on information and belief as to all other matters, including based on an investigation by counsel, alleges as follows:

## I.    NATURE OF THE ACTION

1.    This is a class action against Centr for violating Plaintiff's privacy rights under federal law by knowingly disclosing consumers' personally identifiable information, including "information which identifies a person as having requested or obtained specific video materials or services from a video tape provider" ("Personally Identifiable Information" or "PII"), through the use of a hidden tracking code created by Meta Platforms, Inc. (formerly known as Facebook) ("Meta") and integrated by Centr into Centr's online video service platforms.

2.    Centr owns and operates a subscription-based online video streaming platform called "Centr.com" and related applications. Centr subscribers can request and watch hundreds of fitness and wellness videos from their computer or mobile device.

3.    Unbeknownst to Plaintiff and members of the Class (defined below), Centr knowingly and intentionally discloses its subscribers' video request and viewing history every time they request or watch video content on Centr.com.

4.    Centr shares its customers' PII with Meta for advertising and marketing purposes via certain "pixels" on their website.

5.    The "Meta Pixel" is a hidden tracking code incorporated into the Centr platform that sends Meta time-stamped, personally-identifiable records of consumers, such as Plaintiff and Class members, including information which identifies a person as having requested or obtained specific video materials or services from Centr.

6.    Meta combines this personal information with other information about

CLASS ACTION COMPLAINT

1  each consumer gathered from other sources and uses it for marketing and advertising
2  purposes.

3        7.    The VPPA prohibits "video tape service providers," such as Centr, from
4  knowingly disclosing "information which identifies a person as having requested or
5  obtained specific video materials or services from a video tape service provider" absent
6  informed, written consent and opt-out rights, which Centr does not obtain or provide.

7        8.    Centr violates the VPPA by sharing its subscribers' video viewing
8  histories with Meta via the Meta Pixel.

9        9.    Accordingly, Plaintiff brings this Class Action Complaint for legal and
10  equitable remedies to compensate Plaintiff and members of the Class for Defendant's
11  statutory violations and to end Defendant's practice of knowingly disclosing Centr
12  subscribers' highly sensitive video viewing histories to third parties.

13        **II.    JURISDICTION AND VENUE**

14        10.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because
15  Plaintiff's claims arise under the Video Privacy Protection Act, 18 U.S.C. § 2710.

16        11.    This Court also has subject matter jurisdiction under 28 U.S.C. § 1332(d)
17  because this is a class action in which the aggregate amount in controversy for the
18  proposed Class exceeds $5,000,000, and at least one member of the Class is a citizen
19  of a state different from that of Defendant.

20        12.    Venue is appropriate in this District pursuant to 28 U.S.C. §1391 because,
21  upon information and belief, (a) Defendant's principal place of business is located at
22  2135 Bay Street, Los Angeles, California 90021, (b) Defendant does business in this
23  District, (c) a substantial part of the events or omissions giving rise to the claim
24  occurred in or emanated from this District, and (d) this Court has personal jurisdiction
25  over Defendant.

26        **III.    PARTIES**

27        13.    Plaintiff Glenn Stricker is a resident of Saginaw, Michigan. Plaintiff
28  subscribed to Centr within the last two years and watched videos on Centr during that

time period. Plaintiff has had a Facebook account for more than two years. During the relevant time period, Plaintiff requested and watched videos on Centr while logged into his Facebook account. By doing so, Plaintiff's Centr video request and viewing history was disclosed to third parties, including Facebook, pursuant to the systematic process described herein. Plaintiff did not provide express written consent—in the form required by the VPPA—to the disclosure of his video viewing history.

14.    Centr is a Delaware limited liability company with its principal place of business located at 2135 Bay Street, Los Angeles, California 90021.

### IV.    GENERAL FACTUAL ALLEGATIONS

15.    In the modern digital era, online surveillance by technology companies has become increasingly prevalent. Individuals' actions are tracked, stored in sophisticated databases, and used to create profiles of their likes and dislikes for marketing purposes. As Congress has noted, this new and pervasive surveillance for targeted advertising "is very good business, but it is very cynical." S. Hrg. 112-289, Consumer Privacy and Protection in the Mobile Marketplace.

### A.    The Video Privacy Protection Act.

16.    When first enacted, the Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA"), was the latest in "a long line of statutes passed by Congress to extend privacy protection to records that contain information about individuals." S. Rep. No. 100-599, at 2 (1988).

17.    The VPPA was initially passed in 1988 for the explicit purpose of protecting the privacy of individuals' and their families' video request and viewing data. Leading up to its enactment, members of the United States Senate warned that "[e]very day Americans are forced to provide to businesses and others personal information without having any control over where that information goes." S. Rep. No. 100-599 at 7-8 (1988). By passing the VPPA, Congress sought to "preserve personal privacy with respect to the rental, purchase or delivery of video tapes or similar audio-visual materials." *Id.* at 1.

CLASS ACTION COMPLAINT

18.    Senators at the time were particularly troubled by disclosures of records that reveal consumers' purchases and rentals of videos and other audiovisual materials. As Senator Patrick Leahy and the late Senator Paul Simon recognized, records of this nature offer "a window into our loves, likes, and dislikes," such that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599 at 7-8 (1988) (statements of Sens. Simon and Leahy, respectively).

19.    In proposing the Video and Library Privacy Protection Act (later codified as the VPPA), Senator Leahy stated that "[i]n practical terms our right to privacy protects the choice of movies that we watch with our family in our own homes. And it protects the selection of books that we choose to read." 134 Cong. Rec. S5399 (May 10, 1988). Thus, the personal nature of such information, and the need to protect it from disclosure, is the inspiration of the statute: "[t]hese activities are at the core of any definition of personhood. They reveal our likes and dislikes, our interests and our whims. They say a great deal about our dreams and ambitions, our fears and our hopes. They reflect our individuality, and they describe us as people." *Id*.

20.    While these statements rang true in 1988 when the VPPA was passed, the importance of legislation like the VPPA in the modern era of data mining from online activities is more pronounced than ever before. During a recent Senate Judiciary Committee meeting, "The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century," Senator Leahy emphasized the point by stating that while "it is true that technology has changed" over the years, "we have to be faithful to our fundamental right to privacy and freedom," and "[t]oday the social networking, video streaming, the 'cloud,' mobile apps and other new technologies have revolutionized the availability

CLASS ACTION COMPLAINT

of Americans' information."[1]

21.    Accordingly, the VPPA prohibits "video tape service providers" from disclosing "information which identifies a person as having requested or obtained specific video materials or services" without informed written consent and opt-out rights. 18 U.S.C. §2710.

22.    In this case, Defendant deprived Plaintiff and the Class members of that right by knowingly and systematically disclosing their video request and viewing histories to unauthorized third parties without obtaining informed written consent, as explained herein.

**B.    Centr Video Platform**

23.    Centr owns and operates the Centr platform, which includes their flagship website, Centr.com, and the "Centr" mobile application.

24.    Centr provides an online fitness community and related products, services, content, and features.

25.    Centr offers a catalog of fitness and wellness video courses and content for consumers to watch and to motivate them to reach their fitness and wellness goals over time.

26.    Centr advertises itself as helping subscribers "fuel [their] movement, meals & mind with next-level wellness coaching and tools from Chris Hemsworth's team of experts."

27.    "Centr members get personalized recommendations designed to optimize [members'] results."

28.    The membership features include a "personalized plan," consisting of

---

[1] *See* Committee on the Judiciary, Subcommittee on Privacy, Technology and the Law, The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century, Senate Judiciary Committee Subcommittee on Privacy, Technology and the Law, https://www.govinfo.gov/content/pkg/CHRG-112shrg87342/html/CHRG-112shrg87342.htm (last visited October 20, 2023).

CLASS ACTION COMPLAINT

1  "[w]orkouts, meals and mindfulness to keep [members] on track daily;" a "shopping

2  list" that "writes itself" to "[g]enerate customized meal plans and grocery lists in

3  seconds;" a "plan" to "[t]rack [members'] progress, load and reps;" and to "[i]ntegrate

4  [members'] wearables to maximize [their] Centr experience."

5       29.    "Centr members have over 4,000 workouts at their fingertips."

6       30.    Centr is designed to "[b]uild a stronger mind with a mental fitness routine

7  that sticks."

8       31.    Users are invited to join a weekly newsletter and to "subscribe to the

9  warm-up."

10      32.    Centr subscribers get exclusive access to its products, services, content,

11 and features that are otherwise behind a paywall.

12      33.    Centr offers one, three, and twelve month subscriptions that is currently

13 offered at $119.99 billed every year, $59.99 billed every three months, and $29.99

14 billed every month.

15      34.    To subscribe to Centr, users are required to sign-up.

16      35.    Centr subscribers are required to register by inputting their name and

17 email address and creating a password.

18      36.    The account allows subscribers to access Centr's exclusive and/or

19 restricted content, products, and services, and to join the Centr community. The

20 account establishes a relationship with Centr.  Centr uses the account to establish a

21 commitment between the subscriber and the platform so that the subscriber is

22 motivated to continue using the platform to achieve their fitness and wellness goals,

23 including over an extended period of time. Centr uses the account to establish an

24 association among new Centr subscribers and other members of the community that

25 Centr cultivates. Centr provides subscribers with many opportunities to express

26 association with the platform, including through sharing video content and inviting

27 others to join the community.

28      37.    The content of electronic services available to subscribers is different than

1  the information that is available to those who merely access the website through general

2  internet browsing.

3       38.    Upon information and belief, Centr classifies subscribers who have

4  accounts differently than those who merely access the website through general internet

5  browsing.  Indeed, Centr classifies them as accountholders and/or subscribers and is

6  able to monetize the relationship with accountholders in a manner that it is unable to

7  do with those who merely access the website through general internet browsing.

8       39.    Upon information and belief, access through an account by a subscriber

9  generates value for Centr that mere website access by general internet browsers does

10  not.

11      40.    After a user creates an account and begins using the Centr platform, Centr

12  collects a wide variety of additional sensitive information about its users, including,

13  name and contact information, date of birth, demographic information, username and

14  password that the subscriber may select in connection with establishing an account

15  on Centr's services, fitness and nutrition statistics which the subscriber provides to

16  Centr, emergency contact information, the subscribers photograph, social media

17  handle, or digital or electronic signature, publicly available information (e.g., public

18  posts on the subscribers' social media accounts), details of the products and services

19  (such as membership options) the subscribers have purchased from Centr or which

20  the subscribers have enquired about, and personal preferences such as favorite

21  classes and instructors.

22      41.    Centr collects additional information when the subscriber uses the

23  Centr websites or its apps, including IP address, information on the subscriber's

24  interaction with Centr apps.

25      42.    Centr collects additional information when the subscriber chooses to

26  sync or connect the subscriber's devices, including fitness information with the

27  subscriber's consent (e.g. heart rate, calories, steps, distance, duration, location)

28  collected from third-party fitness devices (e.g. Apple Watch, Android Wear), apps or

CLASS ACTION COMPLAINT

1    services (e.g., Apple Health, Google Fit, Samsung Health).

2        43.    Centr uses technologies (e.g., cookies) to store and/or access information

3    on users' computers or devices in order to process personal data or browsing history.

4    Cookies are small text files that are used as identifiers. Centr transfers these text files

5    to the hard drive of users' computers via the users' web browser and can read them

6    during the users' use of the Centr platform. The cookies allow Centr to (a) track

7    information regarding how users use the Centr platform, and (b) identify the individual

8    users. In that way, Centr collects information that the user's browser sends whenever

9    the user visits Centr's service or when the user accesses the service by or through a

10   mobile device.

11       44.    Centr uses technologies, such as cookies, to collect information about

12   its subscribers' equipment, devices, internet connection, browsing actions, and usage

13   patterns. The information Centr obtains in this manner includes the subscriber's IP

14   address, identifiers associated with their devices, types of devices connected to

15   Centr's services, web browser characteristics, browsing history, device

16   characteristics, language preferences, referring/exit pages, clickstream data, and

17   dates and times of visits to Centr's platform. Centr also obtains information about

18   how subscribers interact with Centr's services, such as features and pages the

19   subscriber visits and search queries.

20       45.    Centr users can request and watch specific video materials through the

21   Centr platform, including on Centr.com.

22       46.    After a user requests specific video materials from Centr, Centr hosts and

23   delivers prerecorded video content for the specific video content requested.

24       47.    The following is an example of the video content available on Centr.

25

26

27

28

CLASS ACTION COMPLAINT



48.     The videos that Centr hosts on its website are integral to its business model of providing fitness and wellness content to consumers.

**C.     The Meta Pixel.**

49.     The Meta Pixel is a "web beacon" that is used to track and disclose individuals' online activities to Meta.

50.     Meta is an advertising company that sells advertising space on the social media platform it operates, including Meta and Instagram.

51.     Meta calls itself a "real identity platform," meaning users are allowed only one account and must share the name they go by in everyday life. Users must provide Meta their first and last name to create an account.

52.     Meta's advertising is based on sophisticated user-categorizing and targeting capabilities that are fueled by the personal data of users of the social media platform and other Internet users.

53.     Meta surveils users' online activities both on and off Meta's own websites and apps, which allows Meta to make highly personal inferences about users, such as about their interests, behavior, and connections.

54.     Meta compiles information it obtains and infers about internet users and uses it to identify personalized audiences likely to respond to particular advertisers' messaging.

CLASS ACTION COMPLAINT

55. The Meta Pixel is a free and publicly available piece of code that Meta allows third-party website developers to install and integrate into their websites.

56. The code that is used to execute the Pixel functions is written into the base code of the website.

57. The Meta Pixel is installed on a website as a first-party cookie.

58. Cookies are small pieces of text used to store information on web browsers. They store and receive identifiers and other information on computers, phones and other devices, and they can serve a number of different functions, such as personalizing content and tailoring and measuring ads.

59. A "first-party cookie option" is designed to circumvent improvements in how web browsers block third-party cookies (a primary means by which Meta historically tracked people across the web). Being embedded in websites as a first-party cookie, rather than as a third-party cookie, causes users' browsers to treat that Pixel as though it is offered by the website they are visiting, rather than by Meta, a third party.

60. When the Pixel is embedded in a website as a first-party cookie, the third-party cookie blocking functions of modern web browsers do not inhibit the Meta Pixel's collection of data.

61. Because of the Pixel design, the Pixel causes users' browsers to treat that Pixel as though it is offered by the website itself.

62. From a technological perspective, the Pixel is a part of the code of the website, and a users' browser understands the Pixel to be a part of the website itself, not a third-party.

63. The Meta Pixel is configured to capture a substantial amount of information by default.

64. Since 2015 when it was introduced, the Meta Pixel has transmitted to Meta HTTP header information, including the URL of each page visited on a website, by default. HTTP Headers collect "IP addresses, information about the web browser, page

CLASS ACTION COMPLAINT

location, document, referrer and persons using the website."

65.    Meta also automatically collects "Pixel-specific Data," which includes "the Pixel ID and cookie."

66.    For Meta account-holders, "Pixel-specific Data" includes the "c_user" cookie, which allows Meta to link data to a particular Meta account with a user ID (a "Meta ID").[2]

67.    The Meta ID is a unique and persistent identifier assigned to each Meta user.

68.    The c_user cookie is personally identifiable information because it contains a consumer's Meta ID. A Meta ID allows anybody—not just Meta—to identify the individual using a website with a Meta account. If anyone types www.facebook.com/[MetaID] into a web browser, it will load that individual's Meta page, which contains a person's name and often a person's photographs and location information.

69.    The Meta ID number is a number—just like a social security number, driver's license number, or telephone number—which can be used by anyone to identify an individual.

70.    A Meta ID is personally identifiable information. Anyone can identify a Meta profile—and all personal information publicly listed on that profile—by appending the Meta ID to the end of https://facebook.com.

71.    A website developer can also choose to track actions taken on their website with the Meta Pixel, called an "Event."  When a chosen action is taken, the Meta Pixel is triggered and sends Meta certain data.  Meta then attempts to match the Events it receives to Meta users.

72.    The developer can then create "Custom Audiences" based on Events and can target ads on Meta's platforms.

---

[2] The Meta ID is also sometimes called a Facebook ID. The terms are used synonymously herein.

CLASS ACTION COMPLAINT

1    73.    Meta associates the information it obtains via the Meta Pixel with other

2    information regarding the user, using personal identifiers that are transmitted

3    concurrently with other personal information the Pixel is configured to collect.

4    74.    Meta assigns a unique numerical identifier to each Meta Pixel and

5    maintains records associating each Pixel with the data it transmits and the website

6    where it is embedded.

7    **D.    Centr Uses The Meta Pixel To Disclose Viewing Histories To Meta.**

8    75.    Centr has integrated the Meta Pixel throughout its website.

9    76.    The numerical identifier associated with the Meta Pixel which currently

10   operates on Centr.com is 476288590735205.

11   77.    Centr provides workout videos across a wide variety of workout

12   categories.

13   78.    Workout videos are often titled and described using acronyms. Merely by

14   way of example, "HIIT" means "high intensity interval training," which is a broad term

15   for workouts that involve short periods of intense exercise alternated with recovery

16   periods. "EMOM" means "every minute on the minute," and the goal of an EMOM

17   workout is to complete a certain number of reps of a particular exercise within 60

18   seconds and to use whatever time is left in that minute to rest before moving on to the

19   next set.

20   79.    Below is a screenshot of what the consumer sees when viewing the Centr

21   workout titled "Quick HIIT EMOM."  The URL identifies that the video requested is

22   a "workout" video, and also includes the specific title assigned to the video by Centr

23   ("Quick HIIT EMOM").

24

25

26

27

28

CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12



13  80.    The below screenshot shows that Centr shares with Meta via the Meta
14  Pixel data that is tied to unique identifiers that identify specific consumers with specific
15  video content. The recipients of the data—e.g., Meta—receive the specific video
16  content requested (the "workout" titled "Quick HIIT EMOM") *and* a unique individual
17  identifier (the individual's Facebook ID), all as part of a single data transmission, as
18  shown in the following screen shot.

19
20
21
22
23
24
25
26
27
28



CLASS ACTION COMPLAINT

81.    Centr also shares with Meta via the Meta Pixel an "Event" called the "PageView" Event that tells Meta, among other data points, the page that the consumer is viewing on Centr.com. The "PageView" Event tells Meta the specific URL of the page the consumer visited, including the title of the specific video materials or services selected for viewing.

82.    Centr also shares with Meta via the Meta Pixel and "Event" called the "Button Click" Event that tells Meta, among other data points, the buttons that the consumer clicks on Centr.com. The "Button Click" Event tells Meta whether and when users click on the button to start or stop a particular video. In addition, the "Button Click" Event shares with Meta whether and when a user subscribes to the Centr service.

83.    On information and belief, at all relevant times Centr understood the functionality of the Meta Pixel—including that it enabled Centr to show targeted advertising to its subscribers based on their video request and viewing history—and thus knew that the Meta Pixel disclosed Centr subscribers' individual video request and viewing histories to Meta.

84.    Tracking pixels such as the Meta Pixel are not necessary for Defendant to operate Centr's video streaming platform and are instead used for the sole purpose of enabling targeted advertising to Defendant's benefit.

85.    As a result of Defendant's data compiling and sharing practices, Defendant has knowingly disclosed to Meta and other third parties for its own personal profit the video viewing histories of Centr's users.

86.    By disclosing its users' video viewing histories to unauthorized third parties—which undeniably reveals their identity and the specific video materials they requested from Defendant's website—Defendant has intentionally and knowingly violated the VPPA.

## V.    CLASS ALLEGATIONS

87.    Plaintiff brings this action individually and on behalf of all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and

23(b)(3), on behalf of the following class (the "Class"):

> During the fullest period allowed by law, all persons residing in the United States who: (a) have a Facebook account; (b) have a Centr account; and (c) requested or viewed video content through the Centr platform, including through Centr.com or the Centr application.

88.    Specifically excluded from the Class are: (1) Defendant, any entity in which Defendant has a controlling interest, and its past or current legal representatives, officers, directors, employees, assigns and successors; (2) the Judge to whom this case is assigned and any member of the Judge's staff or immediate family; and (3) Class Counsel.

89.    Plaintiff reserves the right to modify, change, or expand the Class definition based upon discovery and further investigation.

90.    <u>Numerosity</u>: Members of the Class are so numerous and geographically dispersed that joinder of all members of the Class is impracticable. Plaintiff believes that there are hundreds of thousands of Class members dispersed throughout the United States. Class Members are readily identifiable from information in Defendant's records.

91.    <u>Typicality</u>: Plaintiff's claims are typical of the claims of members of the Class. Plaintiff and members of the Class were harmed by the same wrongful conduct by Defendant in that Defendant caused Centr users' video viewing histories to be disclosed to third parties without obtaining express written consent in a manner that complies with the VPPA and without the requisite opt-out rights. Plaintiff's claims are based on the same legal theories as the claims of other Class members.

92.    <u>Commonality/Predominance</u>: Common questions of law and fact exist as to all Class members. These questions predominate over questions that may affect only individual Class members because Defendant acted on grounds generally applicable to all Class members. Such common legal or factual questions include, *inter alia*:

a) whether Defendant disclosed Class members' video request and viewing histories to Meta or other third parties;

b) whether the information Defendant disclosed to Meta or other third parties constitutes personally identifiable information under the VPPA;

c) whether Defendant's disclosure of Class members' video request and viewing histories to third parties was knowing under the VPPA;

d) whether Class members consented to Defendant's disclosure of their video request and viewing histories in a manner that complies with the VPPA; and

e) whether the Class is entitled to damages or other relief under the VPPA as a result of Defendant's conduct.

93.    <u>Adequate Representation</u>: Plaintiff will fairly and adequately protect the interests of the Class. By prevailing on her own claims, Plaintiff will establish Defendant's liability as to all Class members. Plaintiff's counsel are unaware of any conflicts of interest between Plaintiff and absent Class members with respect to the matters at issue in this litigation; Plaintiff will vigorously prosecute the suit on behalf of the Class; and Plaintiff is represented by attorneys with substantial experience in complex and class action litigation, including in class action privacy litigation. Plaintiff's attorneys have investigated the claims in this action and have committed sufficient resources to represent the Class.

94.    <u>Injunctive/Declaratory Relief</u>: The elements of Rule 23(b)(2) are met. Declaratory and injunctive relief is appropriate in this matter. Defendant has acted or refused to act on grounds generally applicable to Plaintiff and the other Class members, thereby making appropriate final injunctive relief and declaratory relief, as described herein, with respect to the Class members as a whole. Unless a class-wide injunction is issued, Defendant will continue to disclose Centr user's sensitive video viewing histories to third parties as described throughout this Complaint, and members of the

CLASS ACTION COMPLAINT

1  Classes will continue to be harmed and denied their rights under the law.

2    95. <u>Superiority</u>: A class action is superior to other available methods for the

3  fair and efficient adjudication of the controversy. Absent a class action, Class members

4  would likely find the cost of litigating their claims prohibitively high and would

5  therefore have no effective remedy at law. Because of the relatively small size of their

6  individual claims, it is likely that few Class members could afford to seek legal redress

7  for Defendant's misconduct. Absent a class action, Class Members will continue to

8  incur damages, and Defendant's misconduct will continue without remedy. Class

9  treatment of common questions of law and fact would also be a superior method to

10 multiple individual actions or piecemeal litigation in that class treatment will conserve

11 the resources of the courts and the litigants and will promote consistency and efficiency

12 of adjudication. Moreover, the prosecution of separate actions by individual members

13 of the Class could result in inconsistent or varying adjudications with respect to

14 individual members of the Class and/or Defendant.  The benefits of proceeding through

15 the class mechanism substantially outweighs any potential difficulties in management

16 of this class action.

17   96. Plaintiff knows of no difficulty to be encountered in the maintenance of

18 this action that would preclude its maintenance as a class action.

19   97. Plaintiff reserves the right to seek certification of Rule 23(c)(4) of

20 common questions related to Defendants' knowledge, conduct, and duties.

21 **VI. CAUSE OF ACTION**

22 <u>**COUNT 1**</u>

23 **Violation Of The Video Privacy Protection Act 18 U.S.C. § 2710**

24   98. Plaintiff incorporates the allegations contained in the above paragraphs of

25 this complaint as though fully set forth herein.

26   99. The VPPA prohibits a "video tape service provider" from knowingly

27 disclosing "personally-identifying information" concerning any consumer to a third-

28 party without the "informed, written consent (including through an electronic means

CLASS ACTION COMPLAINT

using the Internet) of the consumer." 18 U.S.C § 2710.

100.   As defined in 18 U.S.C. § 2710(a)(4), a "video tape service provider" is "any person, engaged in the business, in or affecting interstate commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials."

101.   Defendant is a "video tape service provider" as defined in 18 U.S.C. § 2710(a)(4) because it engaged in the business of delivering prerecorded video materials to Centr users.

102.   Defendant's business includes delivering Centr users' specific video content hosted on the Centr platform.

103.   As defined in 18 U.S.C. § 2710(a)(3), "personally-identifiable information" is defined to include "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."

104.   Defendant knowingly caused information which identifies Plaintiff and Class members as having requested or obtained specific video materials or services to be disclosed to third parties. This information constitutes personally identifiable information under 18 U.S.C. § 2710(a)(3) because it identified Plaintiff and each Class member to third parties as an individual who requested or obtained specific video materials or services on the Centr platform.

105.   As defined in 18 U.S.C. § 2710(a)(1), a "consumer" means "any renter, purchaser, or subscriber of goods or services from a video tape service provider." As alleged in the preceding paragraphs, Plaintiff is a "consumer" under the VPPA.

106.   Defendant failed to obtain informed, written consent from Plaintiff and other Class members for the disclosures described above in a manner that satisfies 18 U.S.C. § 2710(b)(2)(B).

107.   Defendant knew that Plaintiff's and Class members' personally-identifiable information protected under the VPPA was disclosed to third parties, because, *inter alia*, Defendant chose, programmed, and intended for those third parties

1  to receive the video content requested or obtained and the digital subscribers' specific

2  Facebook ID.

3      108.  By disclosing Plaintiff's and the Class's personally-identifiable

4  information protected under the VPPA, Defendant violated Plaintiff's and the Class

5  members' statutorily protected right to privacy in their video-watching habits. *See* 18

6  U.S.C. § 2710(c).

7      109.  As a result of the above violations, Defendant is liable to the Plaintiff and

8  other Class members for actual damages related to their loss of privacy in an amount

9  to be determined at trial or alternatively for "liquidated damages not less than $2,500"

10  per violation. Under the statute, Defendant is also liable for reasonable attorney's fees,

11  and other litigation costs, injunctive and declaratory relief, and punitive damages in an

12  amount to be determined by a jury, but sufficient to prevent the same or similar conduct

13  by the Defendant in the future.

14  **VII.    PRAYER FOR RELIEF**

15      Plaintiff, individually and on behalf of the other members of the proposed Class,

16  respectfully requests that the Court enter judgment against Defendant as follows:

17      A.    An order certifying the proposed Class pursuant to Federal Rules of Civil

18          Procedure 23(a), (b)(2), (b)(3), and/or (c)(4), designating Plaintiff as the named

19          representative of the Class, designating the undersigned as Class Counsel, and

20          making such further orders for the protection of Class members as the Court

21          deems appropriate;

22      B.    An order declaring that Defendant's conduct as described herein violates

23          the VPPA, 18 U.S.C. § 2710(c)(2)(D);

24      C.    Awarding to Plaintiff and each Class member at least $2,500.00 per

25          violation, as provided by the VPPA, 18 U.S.C. § 2710(c)(2)(A);

26      D.    Awarding punitive damages, as warranted, in an amount to be determined

27          at trial, 18 U.S.C. § 2710(c)(2)(B);

28

1     E.     Awarding restitution and all other forms of equitable monetary relief, 18

2     U.S.C. § 2710(c)(2)(D);

3     F.     Awarding attorneys' fees and costs, as allowed by law, 18 U.S.C. §

4     2710(c)(2)(C);

5     G.     Awarding pre-judgment and post-judgment interest, as provided by law;

6     H.     An order enjoining Defendant from continued violations of the VPPA as

7     alleged herein, 18 U.S.C. § 2710(c)(2)(D);

8     I.     Such other relief as may be appropriate under the circumstances.

## VIII.    JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated:  May 9, 2024         LAW OFFICE OF ROBERT G. LOEWY, P.C.
                              ROBERT G. LOEWY

                              By:    */s/ Robert G. Loewy*
                                      Robert G. Loewy
                              *Counsel for Plaintiff and the Proposed Classes*